# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 8923 | **DATE** | 4/30/2004 |
| **CASE TITLE** | | Cornelius vs. ADP. Inc. | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons stated in the Memorandum Opinion and Order, defendant's motion for summary judgment [32-1] is denied. Joint final pretrial order to be filed by 7/2/04; plaintiff's complete draft shall be served on defendant by 6/22/04. Final pretrial conference set for 7/16/04 at 3:00 p.m. Trial is set for 1/3/05 at 10:00 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices **2** | |
| ✓ | Notices mailed by judge's staff. | | **MAY 0 3 2004** | |
| | Notified counsel by telephone. | | date docketed | **43** |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. District | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 4/30/2004 | |
| | | | date mailed notice | |
| **MD** | courtroom deputy's initials | | **MD** | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| DALE CORNELIUS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 02 C 8923 |
| v. | ) | Judge Joan H. Lefkow |
| | ) | |
| ADP, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DOCKETED**

MAY 0 3 2004

## MEMORANDUM OPINION AND ORDER

Plaintiff, Dales Cornelius ("Cornelius"), has filed a one-count complaint against

defendant, ADP, Inc. ("ADP"), alleging age discrimination in violation of the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.* Before the court is

ADP's motion for summary judgment. The court has jurisdiction over the action pursuant to

29 U.S.C. § 626 and 28 U.S.C. § 1337. For the reasons stated herein, the court denies the

motion.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and

assess the proof as presented in depositions, answers to interrogatories, admissions, and

affidavits that are part of the record. Fed. R. Civ. P. 56(c) Advisory Committee's notes. The

party seeking summary judgment bears the initial burden of proving there is no genuine issue of

material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving

party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court must apply the summary judgment standard with "added rigor" in employment discrimination cases, where intent is the central issue. *Kralman v. Illinois Dept. of Veterans' Affairs*, 23 F.3d 150, 152 (7th Cir. 1994).

## FACTS

### A. ADP's Reduction in Force

In the spring of 2002, ADP reduced its work force in National Account sales (salespersons selling ADP products and services to a list of specific existing customers and potential customers that have between 1,000 and 5,000 employees) on a nationwide basis. (Def. L.R. 56.1 ¶ 8.) Bob Lynch, Vice President of Sales for the Midwest National Account Service Group, prepared a ranking of the sales personnel who reported to him and ultimately decided who would be terminated. (*Id.* ¶ 9.) ADP's staff reduction policy required Lynch to rate employees on four factors (the "RIF factors"): (1) performance and productivity, (2) knowledge and skills, (3) initiative, and (4) tenure. Lynch assigned 0 to 5 points for each category rating from remedial (0 points) to considerably above average (5 points). (*Id.* ¶ 10.) Division headquarters determined that Lynch should only consider performance and productivity from

January 2001 through March 2002 because performance and productivity during that period reflected the downturn in the economy. (*Id.* ¶ 11.)

According to Lynch, "performance and productivity means sales results." (Lynch Dep., at 47.) ADP's Human Resource manager understood that the employees' performance and productivity evaluation would be based on whether or not salespersons met their sales quotas. (Pl. Stat. Of Add'l Facts ¶ 47.) In rating this factor, however, Lynch testified that he considered subjective factors and the length of time an employee worked in National Accounts in addition to an employee's achievement of quota. (Def. L.R. 56.1 ¶ 12.) ADP had no guidelines or written policy regarding the use of a subjective component that was to be considered in rating a salesperson's performance and productivity. (Pl. Stat. Of Add'l Facts ¶ 55.)

Lynch defined the second factor, knowledge and skills, as pertaining to product knowledge and sales skills. (Def. L.R. 56.1 ¶ 14.) Lynch stated that he based this rating on "casual feedback as opposed to specific observations." (Lynch Dep., at 53.) However, Lynch was unable to identify any "feedback" that went into his ratings, stating only that "casual conversations are very hard to recall." (*Id.* at 72-74.) Lynch defined the third factor, initiative and dependability, as pertaining to attitude, collaboration, teamwork, and attendance. (*Id.* at 49-50.) The fourth factor, tenure, was rated based on a point system provided on the evaluation form. (Def. L.R. 56.1 ¶ 16.)

Lynch rated the Midwest National Account sales employees on the RIF factors. ADP's Human Resources Department then weighted the factors, 30% to each of the first two factors and 20% to each of the last two, to produce a ranking of the employees ("RIF ranking"). (*Id.* ¶ 21.) ADP's Staff Reduction Policy required that Lynch terminate the sales persons in the inverse

order of their ranking, lowest score first. (Pl. Stat. Of Add'l Facts ¶ 44.) Based on the RIF

ranking and the salesperson's geographical location, Lynch selected eight salespersons for

termination. (Def. L.R. 56.1 ¶ 18.) The six employees who were ranked lowest on the RIF

ranking list were terminated. Their names, ages, and RIF ranking scores were as follows:

| Name (Age) | Factor 1 | Factor 2 | Factor 3 | Factor 4 | Total |
|------------|----------|----------|----------|----------|-------|
| Susan Weber (30) | 3 | 3 | 3 | 2 | 2.80 |
| Dale Cornelius (51) | 2 | 2 | 2 | 5 | 2.60 |
| Mark Brier (42) | 3 | 3 | 3 | 1 | 2.60 |
| Michael Yaquinto (41) | 2 | 2 | 2 | 4 | 2.40 |
| Dean Diroff (38) | 1 | 3 | 2 | 3 | 2.20 |
| Kimberly Kovacevich (32) | 1 | 2 | 2 | 3 | 1.90 |

(*Id.* at 19, 20.) In addition to the six salespersons at the bottom of the RIF ranking, Lynch

selected two other employees for termination. (*Id.* ¶ 22.)

### B. Cornelius' Job Performance

Cornelius was born on October 15, 1950. (Def. L.R. 56.1 ¶ 1.) Cornelius worked at ADP

from 1985 until he was terminated in the workforce reduction on May 1, 2002. (*Id.* ¶ 2.) From

1991 until his termination, Cornelius held the position of National Accounts District Manager

("NADM"), selling ADP products and services to a list of specific existing customers and

potential customers that had between 1,000 and 5,000 employees. (*Id.* ¶ 3.)

In 1996, ADP's United States Vice President of National Accounts, Kris Borkovich, told

Cornelius that he left his prior job because "he didn't feel he would be very successful if he was

still in sales and over forty." (Cornelius Dep., at 151-52.) Cornelius was then in sales and over forty.

During his employment at ADP, Cornelius made the "President's Club," an honor given to salespersons who exceed their sales quota by a specified percentage, in 1985, 1996, 1997, 1998, 1999, and 2000. Cornelius believes that he has made President's Club on at least two others occasions, but does not remember the years. (Pl. Stat. Of Add'l Facts ¶ 14.) In fiscal years 1999 and 2000[1], Cornelius also won the "Eagle Award," an honor given to salespersons for achieving a certain level of sales. The Eagle Award is harder to get than the President's Club. (*Id.* ¶¶ 15, 21.) In fiscal year 1997, Cornelius achieved 135% of his sales quota. Sixty to sixty-five percent of ADP's National Account salespersons in the Midwest region met or exceeded their quota that fiscal year. (Def. L.R. 56.1 ¶ 6.)

Lynch periodically spoke with Cornelius about particular clients or prospects over a ten-year time span. From January, 2001, until Cornelius was terminated, Lynch was one level above Cornelius' supervisor. (*Id.* ¶ 23.) In this position, Lynch never attended a sales call with Cornelius. (Pl. Stat. Of Add'l Facts ¶ 94.) However, Lynch knew that Cornelius was not meeting his sales quota. (Def. L.R. 56.1 ¶ 24.) In fiscal year 2001, Cornelius achieved 71% of his quota. (*Id.* ¶ 7.) In fiscal year 2002, as of the last month Cornelius worked at ADP (March, 2002), Cornelius had achieved 51% of his quota for the fiscal year. (*Id.* ¶ 26.) During the first portion of the RIF evaluation period, the partial fiscal year ending in June, 2001, only twenty-four of fifty-one salespersons were meeting their quotas, and by the second portion of the RIF evaluation

---

[1]The fiscal year at ADP runs from July 1 to June 30. (Def. L.R. 56.1 ¶ 25.)

period, ending in March, 2002, only thirteen of fifty-two salespersons were meeting their quotas. (Lynch Dep., Ex. 3, at ADP 00199, 00217).

Lynch testified that he perceived that Cornelius "felt that there were problems with our pricing, with our products, and didn't feel that those things would allow him to be successful." (Lynch Dep., at 29-30.) In meetings, Lynch perceived that Cornelius focused on what was wrong with the company and its products. (Def. L.R. 56.1 ¶ 28.) Lynch testified that Cornelius' statements about ADP's products and pricing led Lynch to conclude that Cornelius did not display a positive attitude. (*Id.* ¶ 29.) However, Lynch was unable to identify an example of a pricing problem raised by Cornelius nor identify anything that would refresh his recollection. Lynch also admitted that it was not uncommon for salespeople to complain about prices, and at times these complaints led ADP to lower its prices in an effort to get business. Lynch stated that he wanted salespeople to advise supervisors of ADP prices that were not competitive. (Lynch Dep. at 30, 36-37.)

Lynch testified that from time to time Cornelius was argumentative with clients. (*Id.* at 29.) Lynch could only recall one occasion when he observed Cornelius being "a tad bit on the argumentative side" while on a sales call with a client. (Lynch Dep., at 129.) Lynch also claims that one client, Computer Discount Warehouse, asked for Cornelius to be removed from the account because he misrepresented what a particular product could do. (Def. L.R. 56.1 ¶ 32.) Lynch also believes that another client, Draper and Kramer, asked for Cornelius to be removed from the account. (*Id.* ¶ 33.) Cornelius claims that he does not know of any customer that ever requested that an account be transferred from him, and he claims that he was never involved in

the Draper and Kramer account. (Cornelius Dep., at 35.) Other employees testified that Cornelius' interaction with clients was very good. (Loftus Dep., at 11; Maichel Dep., at 16.)

Lynch also testified that he believed Cornelius had deficiencies in product knowledge, which Lynch defined as the ability to take the features and functions of ADP products and turn them into features and benefits for clients. (Def. L.R. 56.1 ¶ 34.) However, Lynch was unable to identify a specific instance that evidenced Cornelius' deficiencies in product knowledge. (Lynch Dep., at 40.) Other employees testified that Cornelius' product knowledge was above average. (Loftus Dep., at 6-7; Maichel Dep., at 11; Merz Dep., at 7-9.)

Lynch claims that Zurich Insurance, an account that Cornelius had forecast as a potential sales opportunity, issued a request for a proposal ("RFP"), an occurrence that Lynch viewed as negative, since longstanding clients typically do not issue an RFP unless they are not pleased with the current provider's process, service, and relationship. (Def. L.R. 56.1 ¶ 35.) Cornelius claims that Zurich Insurance issued an RFP because, while it liked ADP's products, it was not happy with ADP's pricing and did not feel that ADP's pricing was competitive in the marketplace. Lynch acknowledged that Zurich's dissatisfaction may have been with ADP's products or services. (Pl. Resp. to Def. L.R. 56.1 ¶ 35.)

In early 2002, Lynch met with his management team, including Cornelius' supervisor, Rick Larson ("Larson"). Lynch claims that the purpose of the meeting was to discuss which salespeople had the ability to sell ADP products and services effectively in the current economic climate. He contends that Cornelius was not viewed as someone who had the skill set and attitude to be successful because of his tendency to find more reasons "why not" than reasons "why" or how to succeed. (Def. L.R. 56.1 ¶¶ 36, 37.) Larson testified that the purpose of the

meeting was to discuss what could be done to increase the sales performance and volume in Chicago and to discuss the possibility of a new demonstration strategy. During the meeting, someone commented that Cornelius had a bad attitude. Virtually everyone agreed that Cornelius had a bad attitude that was detrimental to the sales force. (Larson Dep., at 84-5.) Larson felt that Cornelius' negative attitude, exemplified by his complaints of poor client service and high prices, was negatively affecting his ability to sell. (Def. L.R. 56.1 ¶ 40.)

Between January, 2000, and April, 2002, ADP removed thirty-two accounts from Cornelius' territory. Cornelius claims that ADP removed accounts from his account list and assigned them to younger salespersons. (Id. ¶ 61.) Eight of these thirty-two accounts were transferred to employees in the position of National Account Manager ("NAM"). NAM's handled accounts for customers that had over 5,000 employees. Supervisors had the discretion to transfer accounts from NADMs to NAMs when the number of employees exceeded 5000. (Id. ¶ 63-4.) Twelve of Cornelius' accounts were transferred to employees in the position of National Account Relationship Manager ("NARM"), a position created in 2000 to sell, almost exclusively, to existing accounts. (Id. ¶ 66.) In fiscal year 2001, accounts were removed from all NADMs in Chicago to give to employees newly hired into the NARM position. (Id. ¶ 67.) After this reassignment of accounts to NARMs, William Uhrich, Cornelius' supervisor during fiscal year 2001, balanced the NADM territories by moving prospective client accounts between NADMs. The Trustmark and Wickes accounts – both prospective client accounts – were transferred from Cornelius to another NADM pursuant to Uhrich's balancing of the NADM territories. (Id. ¶ 69.) Cornelius asked Uhrich to remove CoreSource from Cornelius' account list. (Id. ¶ 68.) The Searle account was removed from Cornelius' account list because it was part of Monsanto which

is located in St. Louis and has no decision-maker in the area serviced by personnel in ADP's Elk Grove Village (Chicago) office. (*Id.* ¶ 71.) The CCH account was removed from Cornelius' account list because its payroll was processed in California. No one at ADP's Elk Grove Village office was assigned to that account. (*Id.* ¶ 72.) The Kemper Sports and Integrationware accounts were not national accounts because these companies had fewer than 1,000 employees. The Kemper Sports account was later transferred to one of the newer NARM territories. (*Id.* ¶ 73.)

When Cornelius prepared his fiscal year 2002 business plan, he set his goal at 137% of his quota of $950,000. He indicated in the plan that he proposed to reach his goal by selling to eleven clients, which he listed in the business plan. None of those clients were removed from his account list during the remainder of his employment at ADP. (*Id.* ¶¶ 76-77.) Nevertheless, Cornelius claims that the reassignment of accounts reduced his opportunities to make sales, yet his sales quota remained unchanged because ADP does not change sales quotas during the fiscal year. (*Id.* ¶ 61.)

### C. Younger Employees Not Terminated in ADPs Reduction in Force

Lynch testified that in evaluating Cornelius' performance and productivity, he considered only the "stack ranking reports" listing each employee's attainment of quota. (Lynch Dep., at 69.) However, younger employees who achieved a lower percentage of their sales quota received higher ratings on performance and productivity and were not terminated in ADPs reduction in force. (*Id.* ¶ 41.) Specifically, Cornelius claims that Scott Maichel, Matt Rehmann, Wayne Lullo, and Sean Kegel achieved a lower percentage of their sales quotas yet received higher ratings and were not terminated. (*Id.* ¶ 42.) Lynch rated these employees as follows:

9

| Name (Age) | Factor 1 | Factor 2 | Factor 3 | Factor 4 | Total |
|---|---|---|---|---|---|
| Scott Maichel (34) | 3 | 4 | 4 | 3 | 3.50 |
| Sean Kegel (30) | 3 | 3 | 4 | 3 | 3.20 |
| Wayne Lullo (41) | 3 | 3 | 4 | 2 | 3.00 |
| Matt Rehmann (31) | 2 | 3 | 4 | 3 | 2.90 |

(*Id.* ¶ 45.) Lynch explained some of the factors that went into rating these individuals as follows:

**Scott Maichel:** Maichel had been an employee for approximately eleven years in 2002. (Pl. Stat. Of Add'l Facts ¶ 30.) Maichel did not make his quota in fiscal years 2001 and 2002. (*Id.* ¶ 57.) Maichel's stack ranking numbers for the period under consideration in the RIF ranking were lower than those of Cornelius. (*Id.* ¶ 56.) Lynch testified that he perceived Maichel as "a very creative guy, very upbeat, who knows how to take the features and functions of ADP products and services and turn them into benefits for clients." (Def. L.R. 56.1 ¶ 47.) Lynch testified that Maichel's work with the Wallace Business Services ("Wallace") account evidenced these qualities. (Lynch Dep., at 81.) Wallace agreed to make a purchase from ADP, but was acquired by a company on the East Coast the night before the deal was to close. Two different salespeople closed the sale with Wallace and the acquiring company. Lynch testified, "Because of Scott's work through Wallace, the Wallace folks were strong supporters of our initiative with the new parent company." (Lynch Dep. 82-84.) Had Maichel closed the Wallace deal, he would have exceeded his sales quota for the fiscal year. Therefore, Lynch took the Wallace deal into account when evaluating Maichel's performance and productivity for the RIF ranking. (Def. L.R. 56.1 ¶ 49.) Lynch was not aware that Cornelius had any deals that did not close under similar circumstances. (*Id.* ¶ 50.)

**Wayne Lullo:** Lullo did not make his quota in fiscal years 2001 or 2002. (Pl. Stat. Of Add'l Facts ¶¶ 50, 51.) Lynch testified that he gave Lullo a "3" rating for performance and productivity because Lullo was new to National Accounts in fiscal year 2001 and showed an improvement in his performance in fiscal year 2002.[2] (Def. L.R. 56.1 ¶ 51.) Like Cornelius, Lullo had accounts removed from his territory, but does not recall any accounts that were removed mid-year. (*Id.* ¶ 75; Pl. Resp. to Def. L.R. 56.1 ¶ 75.)

**Sean Kegel:** Lynch testified that he gave Kegel a "3" in each of the first two factors and a "4" in the third factor because Kegel achieved President's Club in fiscal year 2001, a year in which few employees in national sales did well. (Def. L.R. 56.1 ¶ 52.) In fiscal year 2001, Kegel made 143% of his quota, while Cornelius made 71% of his quota. (Def. Resp. to Pl. Stat. Of Add'l Facts ¶ 60.) However, Kegel's quota for that fiscal year was less than half of Cornelius' quota. (Pl. Stat. Of Add'l Facts ¶ 61.) At the time of Cornelius' termination, Kegel had made a lower percentage of his quota than Cornelius, and Kegel failed to meet his quota for fiscal year 2002. (*Id.* ¶ 62, 63.) Like Cornelius, Kegel had accounts removed from his territory, but does not recall any accounts that were removed mid-year. (*Id.* ¶ 75; Pl. Resp. to Def. L.R. 56.1 ¶ 75.)

**Matt Rehmann:** In fiscal year 2001, Rehmann made 73% of his quota, while Cornelius made 71% of his quota. (Pl. Stat. Of Add'l Facts ¶ 68.) That year, Cornelius' quota was more than 50% higher than Rehmann's. (*Id.* ¶ 69.) In December, 2001, Rehmann, along with one other employee, received a "verbal warning" from Larson. Larson believed that neither

---

[2]Cornelius contests that Lullo showed an improvement in his performance in fiscal year 2002 "because he did not meet his quota in Fiscal Year 2001 or in Fiscal Year 2002." (Pl. Resp. to Def. L.R. 56.1 ¶ 51.) Lullo's failure to meet his quota in either of these years does not contradict Lynch's statement that Lullo's performance improved. Thus, the statement is taken as admitted.

Rehmann nor the other employee understood or executed appropriate sales strategies, and neither had a track record of success in national sales. This was not true for anyone else Larson supervised at that time. (Def. L.R. 56.1 ¶¶ 57, 59.) At the time of Cornelius' termination, Rehmann had made 19% of his quota while Cornelius had made 51% of his quota. (*Id.* ¶ 70.) Rehmann did not make his quota for fiscal year 2002. (*Id.* ¶ 73.)

Lynch identified three factors that he considered in rating Rehmann. First, Lynch observed Rehmann at a sales call with a client in which Rehmann did an impressive job of handling the meeting with the decision-makers, asking good questions and listening well. (Def. L.R. 56.1 ¶ 54.) Second, Rehmann was only one of two employees covering Wisconsin, and Lynch had to insure that there was adequate territory coverage in that state. Finally, Rehmann's mother died in 2002, and he was absent from work for a period of time. (*Id.* ¶ 56.)

## DISCUSSION

A plaintiff may establish age discrimination under the ADEA through direct or indirect proof. *Huff* v. *UARCO, Inc.*, 122 F.3d 374, 379 (7th Cir. 1997). Cornelius relies on the indirect method of proof. Under this method, the plaintiff bears the initial burden of producing evidence to sustain a *prima facie* case. If the plaintiff meets this burden, the employer must then produce a legitimate, non-discriminatory reason for his action. If the employer offers a legitimate, non-discriminatory reason, the burden shifts back to the plaintiff to present evidence that the employer's proffered reason is pretextual. *Johnson* v. *Zema Systems Corp.*, 170 F.3d 734, 742 (7th Cir. 1999).

1. *Prima facie case*

In the context of a reduction in force, a plaintiff alleging age discrimination establishes a *prima facie* case if he demonstrates that he (1) is 40 or older; (2) was performing to the employer's legitimate expectations; (3) was subject to an adverse employment action; and, (4) similarly situated and substantially younger employees were treated more favorably. *Schuster* v. *Lucent Techs., Inc.*, 327 F.3d 569, 574 (7th Cir. 2003). ADP contends that Cornelius has failed to establish the second and fourth elements of his *prima facie* case.

To show that he was meeting ADP's legitimate expectations, Cornelius points out that he received the President's Club award in at least six of his seventeen years of employment and received the Eagle Award in 1999 and 2000. He also points out that, though he did not meet his sales quota for the RIF evaluation period, many other ADP's salespersons also failed to meet their quotas. During the first portion of the RIF evaluation period, the partial fiscal year ending in June, 2001, only twenty-four of fifty-one salespersons were meeting their quotas, and by the second portion of the evaluation period, ending in March, 2002, only thirteen out of fifty-two salespersons were meeting their quotas.

ADP contends that Cornelius' "acceptable" performance in the past does not negate the fact that he was not meeting ADP's expectations at the time of his termination. ADP cites *Staples* v. *Pepsi-Cola General Bottlers, Inc.*, 312 F.3d 294, 300 (7th Cir. 2002), for the proposition that Cornelius cannot satisfy the second prong of the *prima facie* case by showing satisfactory prior performance. However, the *Staples* court did not address the plaintiff's *prima facie* case, moving instead directly to the issue of pretext. The court held that a plaintiff cannot establish *pretext* by showing satisfactory prior performance. *Id.* Thus, *Staples* is inapposite here.

13

In *Barnhart* v. *Mack Trucks, Inc.*, 157 F.R.D. 427, 431 n.4 (N.D. Ill. 1994), the court held that "plaintiff's 14 years of employment with the defendant imply that [the defendant] was sufficiently satisfied with [plaintiff's] work to meet the *prima facie* showing." While this court would not go so far as to say that the length of employment alone is sufficient to satisfy the second prong of the *prima facie* case, the court finds that Cornelius' prior performance is relevant to the question of whether he was meeting ADP's legitimate expectations.

ADP also contends that the fact that other salespersons were not meeting their quotas is irrelevant to the question of whether Cornelius was meeting ADP's legitimate expectations, citing *Calder* v. *TCI Cablevision of Missouri, Inc.*, 298 F.3d 723, 729-30 (8th Cir. 2002)(holding that plaintiff failed to establish a *prima facie* case because she did not meet her sales budget, despite her argument that other employees also did not meet their sales budgets). Taken to its logical conclusion, this argument would mean that an employer would be free to discriminate against older employees whenever general employee performance flagged. As stated above, by the second portion of the RIF evaluation period, ending in March, 2002, thirty-nine salespersons were not meeting their sales quotas. ADP's argument suggests that it could simply discharge any or all of those thirty-nine employees who were over forty years of age without consequence, because those employees could never state a *prima facie* case of discrimination. This outcome is clearly inconsistent with the purposes of the ADEA. *See Testerman* v. *EDS Tech. Prods. Corp.*, 98 F.3d 297, 303 (7th Cir. 1996)(The ADEA "does not protect merely the older worker who is perfect from the standpoint of his employer. . . . It protects, as a practical matter, the imperfect older worker from being treated worse than the imperfect younger one.").

"The satisfactory performance standard necessary to establish a *prima facie* case is fairly easy to satisfy . . . ." *Barnhart*, 157 F.R.D. at 431 n.4. Cornelius has a seventeen year history of satisfactory, indeed award-winning, performance at ADP. His sales declined in 2001, but such a decline was not unique to Cornelius. Less than half of the salespersons were meeting their quotas in the partial fiscal year ending in June, 2001, and only a quarter were meeting their quotas in the period ending in March, 2002. Together, these considerations are sufficient to satisfy the second prong of Cornelius' *prima facie* case.

ADP also contends that Cornelius has failed to establish that "similarly situated and substantially younger employees were treated more favorably." *Schuster*, 327 F.3d at 574. Employees are similarly situated when they have a common supervisor and possess "analogous attributes, experience, education, and qualifications" relevant to the position. *Radue* v. *Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000). A plaintiff need not show "complete identity" in comparing himself to a younger employee, only substantial similarity. *Id.* at 618. Cornelius identifies four younger employees that he claims were similarly situated but received higher ratings on the RIF factors: Rehmann, Kegel, Lullo, and Maichel. These four employees were, like Cornelius, National Accounts District Managers whom Lynch considered for the RIF. Three of them -- Rehmann, Kegel, and Maichel -- were "substantially younger" than Cornelius.[3] Like Cornelius, neither Maichel nor Rehmann achieved their sales quotas in fiscal years 2001 or 2002.

---

[3] "'Substantially younger' means at least a ten-year age difference; any age difference less than ten years is 'presumptively insubstantial.'" *Fisher* v. *Wayne Dalton Corp.*, 139 F.3d 1137, 1141 (7th Cir. 1998)(quoting *Kariotis* v. *Navistar Int'l Transp. Corp.*, 131 F.3d 672, 676 n.1 (7th Cir. 1997)). Lullo was born on June 28, 1960, so he missed the ten-year mark by 109 days. Though Lullo just misses the ten-year mark, the court cannot consider him "substantially younger" than Cornelius because Cornelius has not directed the court to any evidence that Lynch considered age to be a significant factor. *See Radue*, 219 F.3d at 619 (finding that a 9.5 year age difference, without more, failed to satisfy the "substantially younger" requirement).

Furthermore, though Kegel achieved 143% of his quota in 2001, while Cornelius achieved only 71% of his quota, Kegel's quota was much lower than Cornelius' in 2001. In fact, Cornelius achieved 27.8% higher actual sales than Kegel during 2001.[4]

ADP contends that Rehmann was not similarly situated to Cornelius because Rehmann serviced Wisconsin accounts and did not absorb any of Cornelius' accounts after Cornelius was terminated, citing *Miller v. Borden, Inc.*, 168 F.3d 308 (7th Cir. 1999)(holding that a salesperson was similarly situated with plaintiff where the salespersons covered different geographical territories *and* the younger salesperson absorbed the plaintiffs accounts after the RIF). However, Lynch did not testify that he considered Rehmann's geographical location in rating him on the RIF factors. Rather, he testified that he did not include Rehmann on the termination list because he serviced Wisconsin accounts. This *ex post facto* consideration does not change the fact that, for purposes of the RIF ranking, Rehmann was similarly situated to Cornelius.

ADP also argues that Cornelius was not similarly situated to Maichel because Maichel had superior sales skills. Similarly, ADP argues that Cornelius was not similarly situated to Kegel because Kegel achieved his quota in fiscal year 2001. Such differences constitute facially legitimate, nondiscriminatory reasons for giving Maichel and Kegel higher ratings than Cornelius on performance and productivity. However, these reasons, and others, are precisely what Cornelius is challenging as pretextual. Allowing them to undercut Cornelius' *prima facie* case

---

[4]ADP is correct that it "was at liberty to judge the performance of its sales staff based on their achievement of quota, rather than total dollar sales." (Def. Reply in Support of Mot. For Summ. J., at 6.) However, this argument speaks more to ADP's legitimate, nondiscriminatory reason for terminating Cornelius rather than Kegel than to whether the two were similarly situated. In terms of objective performance, i.e. total dollar sales, the two were similarly situated.

would essentially "short-circuit" the analysis. Thus, the court finds that Cornelius has stated a *prima facie* case of age discrimination.

2. *Legitimate, nondiscriminatory reason*

Because Cornelius has established a *prima facie* case of age discrimination, the burden shifts to ADP to articulate a legitimate, nondiscriminatory reason for terminating Cornelius. ADP contends that it was undergoing a RIF because it was experiencing a lower volume of sales. ADP's reduction policy required Lynch to prepare an RIF ranking to determine which employees would be terminated. The RIF rankings were influenced by a number of factors, including the length of time an employee worked in national accounts, whether an employee was argumentative with clients, the employee's ability to take the features and functions of ADP products and turn them into features and benefits for clients, the employee's attitude, circumstances beyond the employee's control that prevented him from achieving quota, improvement from the prior year's achievement of quota, outstanding performance in 2001 when few employees did well, and personal circumstances, such as absence due to the death of a parent. Based on the RIF ranking and the salesperson's geographical location, Lynch selected eight salespersons for termination. Cornelius was selected for termination because he received one of the lowest RIF rankings among National Account Sales Employees. Because this reason is facially legitimate, the burden shifts back to Cornelius to demonstrate that ADP's reason is pretextual.

3. *Pretext*

To establish that ADP's reasons for terminating him were pretextual, Cornelius must show "that the company's proffered reasons were not the sole determining factors and, therefore,

17

age discrimination might have been a determining factor in addition to the proffered reasons." *Kralman* v. *Illinois Dept. of Veterans Affairs*, 23 F.3d 150, 156 (7th Cir. 1994). Specifically, "an employee must establish that an improper motive tipped the balance in favor of discharge or that the employer did not honestly believe in the reasons it gave for firing him." *Schuster*, 327 F.3d at 574 (quotations omitted). No one piece of evidence need support a finding that age was a determining factor; rather the court must take the facts as a whole. *Huff*, 122 F.3d at 385.

As evidence of ADP's discriminatory intent, Cornelius offers a comment made by ADP's Vice President of National Accounts, Kris Borkovich. In 1996, Borkovich commented that "he didn't feel that he would be very successful if he was still in sales and over forty. Cornelius was then in sales and over forty. Cornelius concedes that this was a stray comment made by a person who did not make the decision in his termination, but contends that discriminatory statements need not be directly related to the employment decision in question to be probative of discriminatory intent in an indirect proof case, citing *Huff*, 122 F.3d at 385. However, Borkovich made the comment six years before Cornelius' termination about his own prior employment. This statement is too tenuously connected to Cornelius' termination to be probative of discriminatory intent.

Cornelius also claims that Lynch applied different standards when evaluating Cornelius than he did when evaluating younger employees. The Seventh Circuit has made it clear that evidence showing that younger employers were treated differently, standing alone, "only goes to show the *prima facie* case." *Rummery* v. *Illinois Bell Tel. Co.*, 250 F.3d 553, 558 (7th Cir. 2001)(citing *Ransom* v. *CSC Consulting, Inc.*, 217 F.3d 467, 470 n.1 (7th Cir. 2000)). Since the court has already held that Cornelius has established a *prima facie* case, such differential

18

treatment is relevant to the pretext analysis only if it calls into question the honesty of the ADP's proffered legitimate, nondiscriminatory reasons for terminating a plaintiff. *See Gustovich* v. *AT&T Communications*, 972 F.2d 845, 848 (7th Cir. 1992)("The question is not whether the employer's ratings were *right* but whether the employer's description of its reasons is *honest*.").

In evaluating Cornelius on Factor 1, performance and productivity, Lynch used only the stack ranking reports listing each employee's achievement of quota. Based on Cornelius' stack ranking report, Lynch gave him a "2" rating on Factor 1. Lynch gave Maichel a "3" rating on RIF Factor 1, despite his attainment of 69% of his quota, compared to Cornelius' 71%, for the fiscal year ending in June, 2001, and despite his attainment of only 44% of his quota, compared to Cornelius' 51%, for the partial fiscal year ending in March, 2002. Lynch also gave Kegel a "3" rating on Factor 1, despite the fact that Cornelius had higher actual sales. Lynch gave Rehmann a "2" rating on Factor 1. Rehmann sales were at 73% of quota as of the fiscal year ending in June, 2001, and were at 19% of quota as of the partial fiscal year ending in March, 2002. Had Lynch given Cornelius a "3" rating on Factor 1 (equal to Maichel and Kegel and one point higher than Rehmann), the resulting 0.3 change in the total RIF Ranking, from 2.6 to 2.9, would have raised Cornelius' total score sufficiently for him to escape termination as one of the bottom six salespersons in the RIF ranking.[5]

Lynch also gave Cornelius a "2" rating on Factor 2, knowledge and skills. He gave Rehmann a "3," despite the facts Larson gave Rehmann a performance warning in December,

---

[5]Cornelius also argues that Lynch evaluated Rehmann differently. However, the court has already held that Rehmann was not similarly situated to Cornelius because Rehmann serviced accounts in Wisconsin. Thus, even if Lynch considered different factors in rating these two differently situated employees, this raises no presumption of discrimination and therefore is irrelevant to the pretext analysis.

19

2001, the middle of the RIF period. The warning was based on Rehmann's lack of understanding or execution of appropriate sales strategies and his lack of a successful track record in national sales. Cornelius received no such warning. In fact, other employees testified that Cornelius' product knowledge was above average and that his interaction with clients was very good.

Lynch explained that he considered the failed deal with Wallace in evaluating Maichel's performance and productivity. Had Maichel closed the Wallace deal, he would have exceeded his sales quota for the fiscal year. Similarly, though Cornelius' actual dollar sales were higher than Kegel's, Lynch explained that Kegel received a higher rating on performance and productivity than Cornelius because Kegel achieved 143% of his quota in fiscal year 2001, a year in which few employees did well. During that year, Cornelius achieved only 71% of his quota. These considerations, standing alone, seem legitimate. However, Lynch has failed to provide any such legitimate explanation for rating Rehmann higher than Cornelius on Factors 1 and 2. Cornelius' sales, as measured by achievement of quota, were substantially higher than Rehmann's for the fiscal year ending in March, 2002. In fact, Rehmann's poor performance garnered him a warning from Larson, who explained that Rehmann lacked understanding of appropriate sales strategies. Yet Lynch gave him a "3" rating on knowledge and skills. Lynch's explanation that Rehmann was not terminated because of his geographical location fails to explain why he received rating equal to Cornelius on Factor 1 and higher than Cornelius on Factor 2. Lynch testified that geographical location was an *additional factor* that he took into account in preparing the termination list. He did not testify that he considered geographical location in rating employees on the RIF factors. This is precisely the kind of "shifting and inconsistent explanation" that can provide a basis for finding pretext, *Schuster*, 327 F.3d at 577,

and it casts a shadow over Lynch's explanation for his ranking Maichel higher than Cornelius despite Maichel's inferior performance. Based on these factors, a jury could find that ADP's proffered explanations for its ranking of Cornelius -- and therefore his consequent discharge -- were pretextual.

## CONCLUSION

For the reasons stated above, ADP's motion for summary judgment [#32] is denied. A joint final pretrial order shall be filed on July 2, 2004; plaintiff's complete draft shall be served on the defendant by June 22, 2004. A final pretrial conference will be held on July 16, 2004 at 3:00 p.m., and this case will be called for trial on January 3, 2005. The parties are referred to the designated magistrate judge for a settlement conference in the meantime.

ENTER: _Joan H Lefkow_

JOAN HUMPHREY LEFKOW
United States District Judge

Dated: April 30, 2004